I.J. WILHITE; First Bank of North Dakota, Fargo, North Dakota, Trustee of the Timothy B. Atkinson Trust, Trustee of the Kathleen L. Atkinson Trust, Trustee of the Thomas P. Atkinson Trust, Trustee of the Patrick J. Atkinson Trust, Trustee of the Elizabeth J. Atkinson Trust, Trustee of the John M. Atkinson Trust, Trustee of the Paul J. Atkinson Trust; and R.F. Schirber, Plaintiffs and Appellees,

v.

CENTRAL INVESTMENT PROPERTIES, a Partnership, Harlan Heinsohn, Gerald W. Engel, William C. Kelsch, Don L. Russell, F.H.M. Inc., Thomas D. Kelsch, Richard D. Olson, and Ernest B. Borr, Defendants and Appellants.

Civ. No. 11276.

Supreme Court of North Dakota.

July 6, 1987.

Fleck, Mather, Strutz & Mayer, Bismarck, for plaintiffs and appellees; argued by Robert J. Udland; appearance by Russell R. Mather.

Kelsch, Kelsch, Ruff & Austin, Mandan, for defendants and appellants; argued by William C. Kelsch.

MESCHKE, Justice.

Central Investment Properties appeals from a judgment awarding $30,673.67 to

I.J. Wilhite and others, denying Central a declaratory judgment fixing the option price for one parcel of land, and denying Central restitution of part of its purchase price for a partial assignment of an option on land. We affirm.

## I. BACKGROUND

On August 20, 1974, I.J. Wilhite and Myron Atkinson obtained a "Land Option Agreement" from Clara Tatley to purchase 2,850 acres, approximately 18 quarter sections, of her farmland near Bismarck. The Option Agreement granted them the right to buy one quarter section of the land "between January 1 and April 15 of each calendar year," beginning in 1974, but "in no event shall such option extend beyond the year 1991." In addition to this "main option," paragraph seven, as modified by an Addendum, set out a "secondary option": "In any calendar year [Wilhite and Atkinson] may elect to purchase one additional quarter section of land." "By way of example only, and in order to indicate the intentions of the parties hereto as to the nature of this transaction," the Option Agreement had a sample schedule attached which indicated that if only the main option was exercised each year for one of the available eighteen quarters, the arrangement would last until 1991.

Except for a price of $500 per acre on six specified quarters, the stated option price was $400 per acre. The price was subject to increase at the beginning of each of the seventh and thirteenth years "in proportion to the increase of the Bureau of Labor Cost of Living Index pertaining to North Dakota over the preceding six year period." [1]

Later, Atkinson transferred half of his one-half interest in the Option Agreement to Richard Schirber and also transferred his remaining interest in four quarters in Section Eighteen to trusts created for his seven children, naming a bank as trustee. The Option Agreement was then owned one-half by Wilhite, one-fourth by Schirber, and, as to the land in Section Eighteen, one-fourth by the bank as trustee for Atkinson's children (hereafter the "Wilhite Group"). Atkinson continued to own one-fourth except as to the land in Section Eighteen.

Exercising the main option each year from 1974 through 1977, the Wilhite Group purchased four quarters. On August 1, 1977, the Wilhite Group entered into a "Sale of Interest in Land Option Agreement" ("Assignment") with Central, a partnership of ten individuals, selling the option rights to the four quarters in Section Eighteen to Central, to be exercised through the secondary option. Central paid a total of $384,000 for the Assignment, $48,000 cash and $336,000 by a promissory note to the Wilhite Group, payable in four annual installments of $48,000 each plus a balloon installment of $144,000 due on August 1, 1982.

The Assignment said:

"Sellers do hereby sell to buyers, and buyers purchase from sellers, that part of sellers' interest in and to that certain Land Option Agreement ... insofar as and only insofar as such Option Agreement covers the right and option to purchase all of [Section Eighteen], in compliance with the provisions of modified paragraph 7 of said Agreement ... and further limited and restricted to the exercise of said option pursuant to modified paragraph 7 of said [Option Agreement], *commencing with the year 1978 and ending on April 1, 1988.*

"...

"In each year buyers agree to notify sellers of their election to exercise the option to purchase on or before November 1st of said year, and shall tender the option exercise price to the sellers. Sellers will acquire in their own name the tract designated upon which buyers have exercised their option and deliver title thereto to the buyers. *In the event the buyers do not make such election un-*

1. On this "Bureau of Labor Costs of Living Index," the trial court found: "Named as such, there is no such thing in North Dakota. The United States Bureau of Labor, however, does publish an index which is called a Consumer Price Index which is a National index and often also called the Cost of Living Index."

der the [secondary option] provisions of modified paragraph 7 of [the Option Agreement], the sellers shall be entitled to exercise the [secondary] option as to lands other than those in [Section Eighteen]...." (emphasis added.) [2]

On September 7, 1977, Clara Tatley conveyed her land to her heirs, subject to the Option Agreement. Her heirs conveyed the land to the Tatley Farm Trust, which thereafter made the conveyances to fulfill the Option Agreement.

Central exercised its assigned secondary option in December of 1977, 1978, and 1979, each time purchasing a quarter in Section Eighteen and leaving the northeast quarter of Section Eighteen [hereafter "NE1/4"].[3] The Wilhite Group purchased two more quarters by exercising its main option in 1978 and in 1979. Thus, at the end of 1979, nine quarters had been purchased and nine quarters, including the NE1/4, remained subject to the Option Agreement.

During the following years, Central did not elect to purchase the NE1/4. The Wilhite Group purchased four more quarters by exercising the main option for one each year from 1980 through 1983 and also purchased two additional quarters in December 1980, apparently exercising the secondary option.[4] (These purchases were each at the stated option price since Tatleys did not use the cost of living adjustment to increase the price in 1980 or after.) So, at the end of 1983, only three quarters, includ-

ing the NE1/4, remained in Tatleys' ownership subject to the Option Agreement.

On July 10, 1982, the Wilhite Group extended the time for Central to pay most of the $144,000 balance on the promissory note after payment of $24,000, scheduling six $20,000 installments at four-month intervals, beginning December 1, 1982.

On November 2, 1983, Atkinson notified Central that the Wilhite Group "do not intend to exercise their option" in 1984, and that "if no party exercises the option" before April 15, 1984, "it would appear that the option expires." On November 16, 1983, William Kelsch, attorney for Central, inquired about quarters remaining available for purchase. Atkinson replied that only the NE1/4 and two other quarters had not yet been purchased. Atkinson wrote Central on February 6, 1984, and again on March 9, 1984, reiterating that "it does not appear [the Wilhite Group] intend to exercise their option" in 1984 and that the option would apparently expire "unless other arrangements are made with the landowner."

By letter on March 16, 1984, Kelsch objected, asserting that Central had paid for the right to have until April 1, 1988, to purchase any quarter in Section Eighteen and that, because the Wilhite Group had purchased "at an accelerated rate," it would be impossible for Central to defer purchase of the NE1/4 beyond 1986. Central requested confirmation that it would have until April 1988 to purchase the

2. When the parties began to perform under the Assignment, they informally simplified Assignment transactions so that title was transferred directly from Tatleys to Central. However, Central continued to exercise the option by notice to the Wilhite Group, and never dealt directly with Tatleys.

3. Since the Assignment was to commence "with the year 1978," Central acted early by purchasing one quarter in 1977. In its brief to this Court, Central rationalized this by stating that under the assignment, "Central, ... was required to give Wilhite notice on or before November 1st of each prior year"; that Central elected to purchase the first quarter by tendering the option price to Wilhite on November 1, 1977; that this was then a 1978 secondary option purchase under the Option Agreement; and that "[t]he same procedure was followed as to

two additional tenders by November 1st of 1978 and 1979, which would be the 1979 and 1980 additional quarter purchases."

This explanation is awkward since the Assignment does not, as Central asserts, require it "to give Wilhite notice on or before November 1st of each prior year." Rather, it states: "In each year buyers agree to notify sellers of their election to exercise the option to purchase on or before November 1st *of said year*, and shall tender the option exercise price to the sellers." (emphasis added).

4. Since the secondary option only granted the right to purchase one additional quarter in any calendar year, Tatleys necessarily acquiesced in the purchase of the second additional quarter in 1980 as being within the terms of the Option Agreement.

NE1/4 "under the terms of the Tatley Option." In early April 1984, Atkinson informally advised Kelsch that arrangements had been made for Central to have until April 1988. Central then paid the next installment on its note to the Wilhite Group.

On April 15, 1984, Wilhite and Atkinson purchased the last three quarters (including the NE1/4) from Tatleys for a price of $400 per acre, through a contract for deed which was recorded on May 11, 1984. On May 10, 1984, an attorney for Wilhite and Atkinson wrote Kelsch asking Central to sign an acceptance of an enclosed "Extension of Land Option Agreement", already executed on behalf of Wilhite and Atkinson:

"FOR VALUE RECEIVED, receipt of which is hereby acknowledged, the undersigned who are now the purchasers of the Northeast Quarter of Section 18, Township 138 North, Range 79 West, pursuant to a Contract for Deed, do hereby extend that "Land Option Agreement" made and entered into on the 20th day of August, 1974, by and between Clara G. Tatley, party of the first part, and I.J. Wilhite and Myron Atkinson, Jr., parties of the second part, to 11:59 PM on the 30th day of April, 1988.

"All of the other terms and conditions of the Land Option Agreement of August 20, 1974, are hereby ratified and confirmed."

Central did not respond to this request.

On July 2, 1984, Atkinson wrote Central, stating that extension of Central's option to April 30, 1988 had been arranged and pointing out that Central was responsible for crop and pasture rent on the NE1/4. Payment of the last note installment due August 1, 1984 and of certain real estate taxes for the NE1/4 was requested. Kelsch wrote back during July, acknowledging that the last note installment and rents were due, but objecting to the claim for taxes. Kelsch also insisted that Central had not received certain mineral rights in the three quarters it had purchased, but he did not mention any claim of breach or anticipatory repudiation of the Assignment.

## II. BATTLEGROUND

When Central did not pay, the Wilhite Group sued. Central admitted owing the final $20,000 installment and $1,600 for rents, but denied owing taxes and counterclaimed for breach of the Assignment. Central sought either a declaratory judgment fixing its option price for the NE1/4 at $64,000 ($400 per acre), or a judgment against the Wilhite Group for restitution of $96,000 as one-fourth of what Central paid for the Assignment on four quarters. Central also asked for an accounting of oil and gas lease payments, as well as a judgment requiring conveyance to it of mineral rights in the three purchased quarters.

During trial, a corrective deed to Central settled the mineral rights claim. After trial, the trial court awarded the Wilhite Group judgment against Central for the $20,000 installment, for interest on it of $7,959.45, for real estate taxes of $1,906.80, for rents of $1,600.00, and for interest on taxes and rents of $835.92. Central recouped $1,028.50 for oil and gas lease payments, so the net money judgment awarded to the Wilhite Group was $30,673.67.

The trial court refused to fix the option price for the NE1/4 and declined to return to Central a part of its purchase price for the Assignment in proportion to the NE1/4, holding that the Wilhite Group had not breached the Assignment. Alternatively, the trial court determined that even if there had been a breach, Central's conduct had waived it; that the extension tendered by Wilhite and Atkinson put Central in as good a position, if not better, by extending its option time to April 30, 1988; and that Central had to mitigate its damages by accepting the tendered extension of the option. The trial court concluded that the issue about the "Cost of Living" price adjustment was "not properly before the Court" and was "not right [or ripe] for judicial determination." It also concluded that a decision about the option price was not required until Central exercised its option to purchase the NE1/4.

On appeal, Central asks for review of an array of issues:

1. Did the Wilhite Group breach the Assignment?
2. Did extension of Central's option retract any repudiation?
3. Did Central waive any repudiation?
4. Did Central have to accept extension of its option?
5. Should the price issue have been decided?
6. Should Central have part of its payment for the Assignment returned?

## III. DECISION

### A. *Breach*

Central argues that the Wilhite Group anticipatorily breached the Assignment by purchasing two additional quarters in 1980, making it impossible for Central to have until 1988 to exercise its option on the NE1/4. The trial court found no breach. This is a finding of fact which we do not set aside unless clearly erroneous. NDRCivP Rule 52(a); *City of Fargo v. Case Development Co.*, 401 N.W.2d 529, 535 (N.D.1987).

Central emphasizes the phrase in the Assignment, "commencing with the year 1978 and ending on April 1, 1988," arguing that a "material part of Central's rights was that it could buy one quarter of the four quarters in Section 18 during any one of the ten years, being 1978 through 1988." Since there were fourteen quarters subject to the Option Agreement in 1977 when the Assignment was made, Central would have had ten years if the Wilhite Group had purchased only one quarter per year through 1987. In this way, the underlying Option Agreement would have stayed in effect through 1987, Central could have purchased any three of the Section Eighteen quarters under the secondary option in any three of those ten years, and yet could still purchase the fourth quarter as late as 1988. Thus, Central argues that when the Wilhite Group purchased at "an accelerated rate," so that an insufficient number of quarters remained to exercise the main option through 1987, they anticipatorily repudiated the Assignment because "there was then no possibility" for Central to have until 1988 to purchase the NE1/4.

The Wilhite Group downplays the phrase "ending on April 1, 1988," as merely describing "the outer parameters" of possible use of the Option Agreement. They argue that Central, as a partial assignee of an option, received "no more, nor no less," than the Wilhite Group had under the Option Agreement. The Wilhite Group points out that the Assignment explicitly continued their secondary right to buy an additional quarter in any year that Central did not buy one in Section Eighteen:

"In the event the buyers do not make such election under the [secondary option] provisions of modified paragraph 7 of [the Option Agreement], the sellers shall be entitled to exercise the [secondary] option as to lands other than those in [Section Eighteen]...."

Thus, their argument goes, "if two quarter sections of land had been purchased each year, which was perfectly permissible under the Land Option Agreement, ... the agreement between all parties would have expired in 1983 because all the land would have been purchased by this date." Since both the Option Agreement and the Assignment unequivocally authorize the Wilhite Group to buy additional quarters, they argue that no repudiation occurred when they made additional purchases. We agree.

Central's claim of an unqualified opportunity to wait until April 1988 is an argument that the phrase "ending on April 1, 1988" conflicts with and controls over the express authorization to the Wilhite Group to use the secondary option when not used by Central. But, Central has not offered any analysis about which of conflicting contract clauses should control. And, if this issue is implicit in Central's argument, then Central's position is not consistent with its concession to the trial court that the Wilhite Group *"had a right to acquire the required 1980 quarter and the extra quarter under modified Paragraph 7,* but buying three quarters in 1980 went beyond the terms of the agreement." (emphasis added).

While, arguably, the Wilhite Group's purchase of three quarters in 1980 may have gone "beyond the terms" of the Option Agreement in one sense, the quarters were nevertheless bought pursuant to the Option Agreement. See footnote 4, supra. Repudiation of the Assignment was not an obvious effect. The Wilhite Group could have purchased an extra quarter in December 1980 and another in January 1981, following express authorizations in both the Option Agreement and the Assignment. The effect would have been the same, shortening the range of the Option Agreement by two years. And, so long as Central did not further exercise the secondary option for a quarter in Section Eighteen, the Wilhite Group might have purchased an extra quarter in each of 1982 and 1983, further shortening the option time by another two years. Under these circumstances, we cannot say that the trial court's factual finding, that the Wilhite Group did not breach the Assignment to Central, was clearly erroneous.

Central claims that this anticipatory repudiation is not a matter of fact, but that the trial court "erred, as a matter of law, in construing the two option contracts; the subsequent legal effect of the parties' conduct, and ... these conclusions of law are fully reviewable...." But, Central misapprehends the scope of the clearly erroneous doctrine under NDRCivP Rule 52(a). This court has increasingly relied upon a trial court's findings construing ambiguous contracts in conjunction with conduct of the parties. *Stracka v. Peterson,* 377 N.W.2d 580 (N.D.1985); *Guskjolen v. Guskjolen,* 391 N.W.2d 639, 642 (N.D.1986). Nevertheless, as a matter of law, construing the Assignment as a whole and giving effect to each part, as we must, (*see Bridston by Bridston v. Dover Corporation,* 352 N.W.2d 194 (N.D.1984)), we reject Central's principal argument that an anticipatory repudiation of the Assignment necessarily occurred in 1980 when the Wilhite Group purchased two additional quarters.

Central claims that the letters in late 1983 and early 1984, telling Central it should buy a quarter to save its option on the NE1/4, were "material anticipatory repudiations" of the Assignment, as well. The premise of this argument parallels Central's principal position: Even if Central had bought a quarter in 1984, it would not have been able to keep the Option Agreement alive to 1988 because not enough quarters remained available.

Our analysis of this argument is similar to our approach to Central's principal position. The Assignment obviously anticipated annual purchase of a quarter by the Wilhite Group in addition to the one allowed by the main option alone whenever Central did not use the secondary option for a quarter in Section Eighteen. Also, in any year the Wilhite Group chose not to exercise its main option, Central was authorized to do so to preserve its secondary option rights as to land in Section Eighteen. No covenant or warranty in the Assignment expressly compelled the Wilhite Group to exercise its main option every year to keep the Option Agreement in force. Rather, the Assignment said:

"Sellers further agree that should they elect not to exercise in any year, subsequent to 1977, their option to purchase a tract of land as provided in the Land Option Agreement ... under the provision thereof other than modified paragraph 7, that they will notify buyers of such intention prior to the 15th day of March in such year, and grant to the buyers the opportunity of exercising such option pursuant to the terms of such Land Option Agreement ... for that year on lands described in [the Option Agreement] other than [those in Section Eighteen] upon which the option to exercise purchase has not previously been made, so as to maintain said option agreement in full force and effect."

Thus, the Assignment and the Option Agreement both clearly contemplated the possibility, though not the certainty, of completion of purchases from Tatleys before 1988. Again, as a matter of law in interpreting the written agreements together and as a whole, as well as a matter of fact in affirming the trial court's finding, we hold that there was no repudiation

of the Assignment by the Wilhite Group's "save your option" letters to Central.

Since there was no breach, it is not essential that we review the trial court's alternative finding that any alleged breach was waived, but it, also, is a matter of fact which we do not set aside unless clearly erroneous. NDRCivP Rule 52(a); *Graber v. Engstrom,* 384 N.W.2d 307, 310 (N.D. 1986). There is evidence about Central's conduct, after knowing about the shortage of quarters for its remaining secondary option to continue to 1988, which is sufficient to support the finding of waiver.

The trial court held, alternatively, that Central must mitigate its damages from any breach by accepting the extension of the option offered by Wilhite and Atkinson. Since there was no breach and since it is conceded by the Wilhite Group that the extension executed by Wilhite and Atkinson is binding whether formally accepted by Central or not, the trial court's ruling, that the executed extension "extends the time under the Land Option Agreement to April 30, 1988" for Central to exercise its option on the NE1/4, cannot be erroneous.

### B. *Price*

The trial court refused to fix the price which Central must pay for the NE1/4, if and when Central decides to buy it. Central makes that price its principal concern, sprawling throughout its arguments.

But, Central's contention goes beyond calculating "cost of living" increases to the basic option price. See footnote 1, supra. Central challenges whether it must pay any increase in price for the NE1/4 when Tatleys did not require any increase from Wilhite and Atkinson for the NE1/4, nor from the Wilhite Group for any quarter purchased since 1980. Central argues that, as an assignee of the Tatley option, it is entitled to "the Tatley price as charged by Tatley," or the $400 per acre price (totalling $64,000 for the NE1/4) which Wilhite and Atkinson contracted to pay Tatleys. "When Tatley decided not to invoke the cost of living adjustment, must not Central be the beneficiary of that decision?," Central asks.

Central employs this price argument several ways. Central objects to the tendered extension to April 1988 because it recites that it is subject to "all of the other terms and conditions of the Land Option Agreement." Central says that this phrase is intended to "impose the waived price adjustment," which it asserts "would increase Central's price from $400.00 to $872.00," per acre. Therefore, Central contends that the extension was not "an adequate legal retraction" of the repudiation. The trial court made no findings on these matters and we are in no position to do so. Since there was no breach, it is unnecessary for us to decide whether the extension was a retraction of a repudiation.

Central also makes much of this price argument as to mitigation of damages. Since, at least in part, the extension "constituted a new offer from a stranger [Atkinson] to this action," Central claims it was "legal error" for the trial court to hold that Central must accept the extension to mitigate its damages. If it must accept the extension from Wilhite, Central argues that, at least, it should stand in the shoes of Wilhite, as its assignor, and benefit from the price he paid in buying the NE1/4 from Tatleys. But, absent a breach, no mitigation is compelled. Therefore, an issue about price comes into play only if Central seeks to exercise the option pursuant to the extension.

Central's price argument trails off with a concession that "the Trial Court could not fix Central's option price at Tatley's price of $400.00, not because to do so would be premature, but because any decision on this point would not be binding on the present owners of the property." Central recognizes that Atkinson "has no contractual relationship with Central and more importantly, is not a party to this litigation, [and] would not be bound." Thus, Central essentially concedes that the trial court did not err in declining to decide the price issue.

This recognition follows our holding in *Aberle v. Karn,* 316 N.W.2d 779, 781 (N.D. 1982), that a declaratory judgment may determine rights under a written contract,

"but the court, in its discretion, may refuse where the judgment entered would not terminate the controversy giving rise to the proceeding (§ 32–23–06, NDCC)." We also said:

> "That discretion is not unlimited. Courts may, under proper circumstances, grant declaratory relief even though the declaration would not terminate the underlying controversy, if it can be of some help to end the controversy. Courts should not, however, give advisory opinions or answer moot, abstract, theoretical, academic, hypothetical, or speculative questions." *Id.* at 782.

■ NDCC § 32–23–11 commands that "all persons who have or claim any interest which would be affected by the declaration shall be made parties" to an action for a declaratory judgment, and that "no declaration shall prejudice the rights of persons not parties to the proceeding...." The trial court could not have finally fixed the option price for the NE1/4 because one of the present owners of that quarter, Atkinson, was not a party to Central's counterclaim for such a declaratory judgment. Therefore, the trial court was correct in denying Central a declaratory judgment about the option price for the NE1/4.

### C. Restitution

Having conceded that the trial court was "powerless" to fix the option price for the NE1/4, Central argues that, for that reason alone, it is entitled to restitution of a one-fourth part of what it paid for the Assignment. One-fourth is the proportion of the remaining NE1/4 to the four quarters in Section Eighteen which were originally the subject of the Assignment. Central explains:

> "Because of Atkinson's intrusion, [by purchasing an interest in the NE1/4], Plaintiffs simply cannot complete their committed performance to Central. For Central to acquire the NE1/4, it must deal with a stranger at that stranger's price, which is over double that charged by Tatley. The Plaintiffs cannot pass on to Central the Tatley's $400.00 per acre price because neither Tatley nor they own the NE1/4.

> "This leaves Central with only one remedy, and that is a return of that part of its option price attributable to the NE1/4, which is the sum of $96,000.00, less the $20,000.00 it has not paid, or a net of $76,000.00, plus a return of the 18% interest it has paid on the $96,000.00 at 18% per annum."

■ Without a breach, restitution of a benefit conferred by contract is not usually in order. Restatement of the Law, Contracts (Second) § 373. We have affirmed the trial court's finding that there was no breach. Unless Central is unable to obtain conveyance of the NE1/4 when it seeks to exercise its option, we do not see how Central would be entitled to return of any part of the money it has paid for the Assignment.

Since the trial court did not fix an option price, we cannot. Since it has not been determined that Central cannot enforce the option against Wilhite and Atkinson, restitution was properly denied.

Contrary to Central's basic assumption, the trial court's lack of power to fix the option price stems from Central's failure, not any default on the part of the Wilhite Group. Central simply failed to make Atkinson a party defendant to its counterclaim seeking declaration of the option price. NDRCivP Rule 13(h) and Rule 20. *See* Notes of Advisory Committee on Rules for the 1966 Amendments to Rule 13(h) of the Federal Rules of Civil Procedure, Federal Civil Judicial Procedure and Rules (1986; West Publishing Co.), p. 41.

Central presses another reason for restitution: The extension "is, in fact, a new deal and it doesn't come from" the Wilhite Group:

> "Because Atkinson owns one-half of the NE1/4, a deed would have to come partially from a stranger and Central has not consented to a deed from a stranger."

Central cites NDCC § 9–11–03 and *Skinner v. Scholes*, 59 N.D. 181, 229 N.W. 114 (1930) to support this argument.

But, *Skinner*, which construed NDCC § 9–11–03 (limitation on assigning the burden of an obligation without the consent of the party entitled to its benefit), does not stand for the broad proposition that a vendee in an executory contract for sale of land can never be compelled to accept the deed of a third party. Rather, it stands for the more limited proposition that a vendee cannot be compelled to accept such a deed where the contract contained personal covenants of the vendor which do not run with the land. *See* Anno: *Deed of one acquiring vendor's title as meeting vendor's obligation,* 109 A.L.R. 182, and *compare Weiser v. Ekre,* 67 N.D. 185, 271 N.W. 147 (1937).

Although, by consent, the first three quarters were conveyed directly from Tatleys to Central, Central is only expressly entitled to a conveyance from the Wilhite Group under the Assignment. See footnote 2, supra. The Assignment, which incorporates the Option Agreement by reference, does not require any personal covenants that would not run with the land. Thus, this line of argument does not help Central.

Accordingly, we affirm the trial court's denial of restitution.

## IV. CONCLUSION

Since there was no breach of the Assignment by the Wilhite Group, and since Central is neither entitled to an adjudication of the option price for the NE1/4, nor to return of a proportionate part of what it paid for the Assignment, we affirm the judgment of the trial court.

ERICKSTAD, C.J., LEVINE, J., and PEDERSON and ILVEDSON, Surrogate Justices, concur.

PEDERSON and ILVEDSON, Surrogate Justices, sitting in place of GIERKE and VANDE WALLE, JJ., disqualified.